## CHERRY RIVER BOOM & LUMBER CO. v. UNITED STATES.

### No. 57.

District Court, S. D. West Virginia, at Charleston.

Sept. 10, 1940.

C. H. Welles, 3d, of Scranton, Pa., and John M. Wolverton and Brooks B. Callaghan, both of Richwood, W. Va., for plaintiff.

Charles M. Love, Jr., Asst. U. S. Atty. of Charleston, W. Va., and Linton B. West, Regional Law Officer, of Washington, D. C., for defendant.

McCLINTIC, District Judge.

This is a civil action instituted by the Cherry River Boom & Lumber Company, a West Virginia Corporation, against the United States of America, pursuant to the provisions of the so-called Tucker Act, as amended, Section 41(20), Title 28 U.S. C.A., to recover the cost of labor and materials furnished in suppressing a forest fire which occurred on certain lands in the Monongahela National Forest, under the terms of a deed whereby the title to such lands was conveyed to the United States by the plaintiff. The plaintiff had reserved certain timber on the land conveyed to the government, including the territory of the fire in question, and the deed contains pro-

visions covering the rights and obligations of the Lumber Company in case of fire.

Paragraph 5 of the deed (pages 113, 114) contains the following provisions:

"5. While carrying on logging operations the owner of the reserved timber and all his employees, at work within the bounds of the land acquired hereunder shall without any charge or expense to the United States use every reasonable precaution to prevent and suppress forest fires upon or threatening their logging operations on the lands upon which reserved timber under this agreement remains uncut. The owner of the reserved timber shall place himself and all his employees at the disposal of the forest officer in charge for the purpose of fighting forest fires on the lands conveyed by him to the United States, with the understanding that if the fire does not threaten his logging operations or the timber reserved by him, he shall be paid for the services so rendered at the rate or rates to be determined by the forest officer in charge, which rate or rates shall correspond to the rate or rates of pay prevailing in the locality for services of a similar character at the time the services are rendered. * * * Provided further that if the owner of the reserved timber, his employees, contractors or their employees are responsible for the origin of the fire, then he shall not be paid for services so rendered."

Let it first be stated that it is undisputed that plaintiff furnished certain labor and materials of the reasonable value of $4,970.06 for the suppression of the fire out of which this proceeding arose. Furthermore, it was established in a previous suit between the same parties, United States of America v. Cherry River Boom & Lumber Company, that plaintiff, its contractors and employees, were not responsible for the origin of the fire.

Therefore the only question to be decided herein is whether the fire threatened the reserved timber or logging operations of the plaintiff.

The fire was first discovered in the afternoon of June 1, 1936, on the Little Fork of Williams River in Webster County, West Virginia. It burned a wide area in that territory where there were considerable hemlock and spruce slashings. It is undisputed that the nearest uncut timber to the fire in which the Lumber Company had any interest was at the Three Forks of the Williams River, approximately a mile and a half from the fire and about five hundred feet lower in elevation.

The area between the fire and the place where Alex Williams was working this uncut timber was a cutover area containing green standing hardwood, blackberry briars, cleared land in sod and various roads, trails and streams. The court is quite familiar with the section of Webster County where this fire occurred and where plaintiff's operations were being conducted, and is also familiar, by virtue of personal experience, with the activities and spread of forest fires across areas such as that between the standing timber of plaintiff at Three Forks and the point where the fire was first discovered. To threaten or damage any of plaintiff's reserved timber the fire would have had to burn down hill and across a mile and a half area that had been cut over and was grown up in hardwood and blackberry briars, in which the sap was up, that was cut by numerous roads, trails and streams and which contained several plots of rocky green sod where there was nothing that would burn. It would require a considerable stretch of the imagination to find a threat to plaintiff's reserved timber at Three Forks under such conditions. This is amply supported by the testimony of plaintiff's witnesses, who were seasoned lumbermen with a wide experience in fighting forest fires, and the facts are not disputed by the testimony of the government witnesses.

The court must necessarily conclude that as a matter of fact plaintiff's reserved timber was not threatened by this fire.

It therefore follows that unless the fire threatened plaintiff's logging operations, plaintiff may recover under the terms of the deed the value of the labor and materials expended by it in suppressing the fire.

It is stated by Nelson Courtland Brown, Professor of Forest Utilization, the New York State College of Forestry of Syracuse University, at page one of his textbook "Logging Principles and Practices", that

"Logging may be divided into the following main divisions:

"(1) The felling and preparation of logs for transport.

"(2) Minor transportation, or log assemblage.

"(3) Major transportation, or main log haul.

"Logging has principally to do with the production of saw logs, which are the primary product of the forest. It includes also, however, the production of large quantities of pulpwood, cross ties, poles, piling, mine timbers, veneer logs, bolts, and miscellaneous other forms."

In the words of C. S. Badgett, witness for the plaintiff, "A logging operation is harvesting the timber or taking it from the stump and delivering it to the point of sawing, using such equipment as is necessary to do that. That equipment consists of camps, teams, tractors, skidders, railroads, logging loaders and locomotives."

Plaintiff's evidence tends to establish that on the day of the fire one of its trains was up in the burned area picking up the last bit of cut timber of any value to it that was in that area, that the last of the logs and pulpwood which it intended to take from that area had been taken out the day before, and that this crew was up there on the day of the fire for the purpose of cleaning up and bringing down one shanty car that had been left up the river. Plaintiff's employees and contractors testified that the last thing of value in or near the burned area, except the railroad track and ties, was taken out when the fire was discovered, and that the only time any of them were up in the burned area after the fire was when a crew went up to pull the rails and ties, which they say were not damaged by the fire.

Defendant's evidence indicates that two of the men called in by the government to direct the fire fighting saw cut timber and a few logs between the track and the creek and near the end of the steel, which was burned in the fire, and that a pump and a crew of men were placed near one of the trestles on the railroad track to protect it from the fire. And one of defendant's witnesses, Gabe Rose, testified that he saw two of plaintiff's employees, Blaine Irvin and George Gum, take a locomotive and loader up the track after the fire and carry out pulpwood.

The testimony of Rose is directly contradicted by Irvin and Gum, who made reference to their time books to show that they were not up in the burned area after the fire. The small amount of pulpwood and logs seen by the government Forest Service men is explained by plaintiff as being culls or rotten wood and logs which had not met specifications and had been returned to the contractor and dumped along the side of the track. As defendant's witnesses admittedly did not examine the timber they saw but merely noticed it along the track as they rode by, the court is inclined to believe plaintiff's witnesses and conclude that all merchantable lumber and all the shanty houses of any value were taken out of the burned area before they were actually threatened by the fire. The only thing belonging to plaintiff that was not removed before it was threatened by the fire was the railroad track.

■ A railroad that is being used to transport timber from the place where it is cut to the place where it is sawed into logs or split into pulpwood or other forms is undoubtedly a part of the logging operation so long as there remains timber to be transported over it. However, when all such timber has been removed the railroad ceases to be a part of a logging operation. Regardless of what definition for "logging operation" is used, common sense dictates that a railroad alone, the use for which has become unnecessary because everything to be carried on it in connection with the cutting and removal of timber has been done, does not of itself constitute a logging operation.

■ In the instant case, all the logs and pulpwood that plaintiff wanted to remove from the burned area or the vicinity thereof, were removed before the fire threatened them. The railroad was no longer of any use to plaintiff, unless it was pulled out and the steel and ties used in some other operation. When its usefulness as a part of the logging operation of plaintiff in this area ceased, it was no longer a part of plaintiff's logging operation within the terms of the deed. Its usefulness ceased in the instant case when the last trainload was taken down the creek. There was never any danger that that last trainload could not be taken out without being burned, unless it was left there for an unreasonable length of time. Therefore the railroad ceased to be a part of plaintiff's logging operation in that area before such operation was threatened by the fire.

Defendant contends that the fire threatened to burn the wooden trestles along the railroad and therefore threatened a part of plaintiff's logging operations. Those trestles had no salvage value for plaintiff and their usefulness to plaintiff had ceased to exist after the last trainload of timber passed over them. Their only usefulness

to plaintiff after that was in permitting plaintiff's crew to go up the track to pull out the rails and ties. But the removal of that track certainly could not be said to be part of a logging operation. Plaintiff would have been justified in leaving the track where it was for years or at least until the eight-year period provided in the deed expired or in abandoning it entirely and it surely could not be said that plaintiff was conducting logging operations in that area long after all the timber had been cut and removed, merely because the railroad had not been removed.

It is the opinion of this court that the fire did not threaten either the reserved timber or the logging operations of the Lumber Company and that the Lumber Company is therefore entitled to recover from the government the value of labor and materials expended by it in suppressing the fire under the terms of the deed.

Judgment for plaintiff.